**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **MONDONA MAJIDI-AHY,** *individually and on behalf of all others similarly situated,* | ) ) ) |
|  | ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) |
|  | ) |
| **CLASSPASS, INC. et al.,** | ) ) |
| **Defendants.** | ) ) |
| _____ | ) |

NO. 2:25-cv-05003-KS

**ORDER GRANTING MOTION TO STAY PENDING ARBITRATION [DKT. NO. 29]**

**INTRODUCTION**

Before the Court is the Motion to Stay Pending Arbitration filed by Defendants ClassPass LLC, ClassPass USA LLC, and Mindbody, Inc. (collectively, "ClassPass" or "Defendants") on September 8, 2025. ("Motion," Dkt. No. 29.)  Plaintiff Mondona Majidi-Ahy filed her Opposition to the Motion on October 16, 2025.  (Dkt. No. 34.)  Defendants filed a Reply on November 26, 2025.  (Dkt. No. 35.)

On December 3, 2025, the Court vacated the previously set hearing on the Motion and took the Motion under submission for decision without oral argument.  (Dkt. No. 36.)  For the reasons discussed below, Defendants' Motion is **GRANTED**.

1

## FACTUAL BACKGROUND

### I.    2021 Terms of Use

"ClassPass is a credit-based membership that grants you access to thousands of studios, gyms, salons, [and] spas . . . ."[1]  On November 15, 2021, Plaintiff, a California resident, signed up for a two-week free membership trial on the ClassPass website.  (Declaration of Karen Teng[2] ("Teng. Decl."), Dkt. No. 29-4 ¶ 3.)  To complete the sign-up process, Plaintiff had to navigate through five webpage screens prompting her to input the information needed to create her account.  (*Id.* ¶¶ 4-8, Exs. A-E.)

On the first screen, Plaintiff was prompted to either enter her email address or register via her Apple or Facebook account to proceed to the next screen.  (*Id.* ¶ 4, Ex. A.)  The second screen prompted Plaintiff to input her first and last names in the appropriate fields and then click the "Continue" button.  (*Id.* ¶ 5, Ex. B.)  The third screen prompted Plaintiff to input her phone number in the appropriate field and then click the "Continue" button.  (*Id.* ¶ 6, Ex. C.)  Upon inputting her phone number, Plaintiff was sent a four-digit code via text message.  (*Id.* ¶ 7.)  On the fourth screen, Plaintiff was prompted to input the code that she received into the appropriate fields.  (*Id.*, Ex. D.)  Finally, on the fifth screen, Plaintiff was prompted to input her credit card information and then click the blue "Start your free trial" button.  (*Id.* ¶ 8, Ex. E.)  Between the payment information fields and the "Start your free trial" button was text that read: 'By clicking the button below, you agree to the Terms, and your free 14 days 20-credit trial will begin.'"  (*Id.*)

---

[1] ClassPass, *What is ClassPass?*, https://classpass.com/walkthrough/edusignup.

[2] Karen Teng declares that she is Vice President of Software Engineering at MINDBODY, Inc., ("Mindbody") the parent corporation of ClassPass, LLC ("ClassPass").  (Dkt. No. 29-4 ¶ 1.)  Ms. Teng further declares that she "worked for ClassPass from 2015 through May 2022 as the Director of Engineering and returned as a Mindbody employee on November 29, 2022, to [her] current position."  (*Id.*)  Additionally, Ms. Teng declares that through her position, she has "access to the systems of record that ClassPass uses to store certain ClassPass business and user records and data in the ordinary course of ClassPass' business," including "systems that track changes with the user experience, such as the online account creation and purchase flow and the checkout page that are live on the website at a particular time."  (*Id.*)

The word "Terms" appeared as a blue hyperlink that if clicked, would redirect the user to the ClassPass 2021 Terms of Use.  (*Id.*)

The second paragraph of the 2021 Terms of Use provided: "THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT REQUIRE YOU TO ARBITRATE ALL DISPUTES YOU HAVE WITH CLASSPASS ON AN INDIVIDUAL BASIS." (Declaration of Jessica Van Meter[3] ("Van Meter Decl."), Dkt. No. 29-5 ¶ 3, Ex. A.)  The 2021 Terms of Use also provided that "ClassPass may amend the Terms from time to time"; that "all amendments will be effective upon posting of such updated Terms"; and that "continued access to or use of the Site or Classes after such posting constitutes your consent to be bound by the Terms, as amended."  (*Id.*)

When Plaintiff's free trial ended on November 29, 2021, she made her first subscription fee payment and became a ClassPass member.  (Teng Decl, Dkt. No. 29-4 ¶ 10.)  As of September 2025, Plaintiff has remained "an active ClassPass user" and "continued to pay her monthly subscription fee, most recently paying $149.00 on August 7, 2025."  (Declaration of Danielle Doremus[4] ("Doremus Decl."), Dkt. No. 29-3 ¶ 3.)  Since becoming a ClassPass member, Plaintiff "has engaged in more than 200 transactions with ClassPass" and "has used ClassPass regularly in each year from when she signed up in November 2021 through 2025." (*Id.* ¶ 5.)

---

[3] Jessica Van Meter declares she is Director of Compliance & Controls at Mindbody.  (Dkt. No. 29-5 ¶ 1.)  Ms. Van Meter further declares that she has worked for ClassPass since March 11, 2019 and for Mindbody since Mindbody acquired ClassPass on October 15, 2021.  (*Id.*)  Additionally, Ms. Van Meter declares that she has "access to the systems of record that ClassPass uses to store certain ClassPass business and user records and data in the ordinary course of business," including "historical records of ClassPass' Terms of Use available at www.classpass.com."  (*Id.*)

[4] Danielle Doremus declares she is Senior Director of Business Operations & CX at Mindbody.  (Dkt. No. 29-3 ¶ 1.)  Ms. Doremus further declares that she has worked for ClassPass since 2015, for Mindbody since October 15, 2021, and in her current position since August 2022.  (*Id.*)  Additionally, Ms. Doremus declares that she has "access to the systems of record that ClassPass uses to store certain ClassPass business and user records and data in the ordinary course of business," including "records and data on account creation such as when a member created an account, purchase and payment data, member class reservation records, and customer support records."  (*Id.*)

3

## II.  <u>2024 Terms of Use</u>

On August 9, 2024, ClassPass updated its Terms of Use.  (Declaration of Ingrid Chang[5] ("Chang Decl."), Dkt. No. 29-2 ¶ 2.)  On August 10, 2024, Plaintiff received an email notifying her of the updated Terms of Use and providing her with a hyperlink to the then-effective 2024 Terms of Use.  (*Id.* ¶ 3.)  On August 11, 2024, Plaintiff was presented with a pop-up window in the ClassPass mobile application, which also notified her of the hyperlinked updated 2024 Terms of Use and prompted her to confirm whether she agreed to the 2024 Terms of Use by clicking a blue "I agree" button.  (*Id.* ¶4.)  On that day, Plaintiff clicked on the "I agree" button two times. (*Id.* ¶ 6.)

The second paragraph of the 2024 Terms of Use contained the following provision:

UNLESS PROVIDED OTHERWISE IN THE APPLICABLE REGIONAL AMENDMENT BELOW, THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT REQUIRE YOU TO ARBITRATE ALL DISPUTES YOU HAVE WITH CLASSPASS RELEASEES ON AN INDIVIDUAL BASIS. PLEASE SEE SECTIONS 18 AND 19(J) FOR MORE INFORMATION ABOUT THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND CLASSPASS RELEASEES WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION. YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS WIDE ARBITRATION.

---

[5] Ingrid Chang declares she is Director of Lifecycle Marketing at Mindbody.  (Dkt. No. 29-2 ¶ 1.)  Ms. Chang further declares that she has worked for ClassPass since September 23, 2019 and for Mindbody since Mindbody acquired ClassPass on October 15, 2021.  (*Id.*)  Additionally, Ms. Chang declares that she has "access to the systems that ClassPass uses to both send users pop-up mobile application communications and record data about those mobile application communications, including when those communications are delivered, opened, and interacted with by users."  (*Id.*)

(Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B.)   The 2024 Terms of Use also contained the following provision:

> By accessing and/or using the Site and/or Offerings, either through ClassPass, your employer, or another third party; clicking any button to indicate your consent; or otherwise indicating your consent to these Terms, you accept and agree to be bound by these Terms and all terms, conditions, and limitations associated with them that are posted on the Site and the ClassPass Privacy Policy, just as if you had agreed to these Terms in writing. If you do not agree to these Terms, do not use the Site or any Offerings.

(*Id.* § 1(a).)

## III.   Arbitration Agreement

Section 18(a) of the 2024 Terms of Use contained the following Arbitration Agreement:

> WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL DISPUTES[6] . . . WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR OMISSIONS IN THE PAST OR IN THE FUTURE, WILL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION

---

[6] The 2024 Terms of Use define dispute as "any dispute, claim, or controversy between you and ClassPass Releasees regarding any aspect of your relationship with ClassPass Releasees, whether based in contract, statute, regulation, ordinance, tort . . . , or any other legal or equitable theory, and includes the validity, enforceability or scope of this Arbitration Agreement . . . ." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a).)  The 2024 Terms of Use define releasees as "CLASSPASS, ITS PARENTS, SUBSIDIARIES, AND AFFILIATED ENTITIES, AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, CONSULTANTS, CONTRACT EMPLOYEES, REPRESENTATIVES AND AGENTS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS." (*Id.* § 9(k).)

1    RATHER THAN IN COURT IN ACCORDANCE WITH THIS ARBITRATION

2    AGREEMENT.

3

4    (*Id.* § 18(a).)   Section 18(c) mandated that "[a]ll issues shall be for the arbitrator to decide,

5    including the scope of this Arbitration Agreement."   (*Id.* § 18(c).)   Section 18(e) further

6    mandated that "[e]xcept as expressly provided herein, the arbitrator will decide the jurisdiction

7    of the arbitrator and the rights and liabilities, if any, of you and ClassPass Releasees."   (*Id.* §

8    18(e).)

9

10   **IV.    <u>Litigation</u>**

11

12         On June 2, 2025, Plaintiff initiated this consumer class action challenging Defendants'[7]

13   "unlawful practice of imposing financial penalties on customers when they miss classes they

14   had already paid for in full."   (Dkt. No. 1 ¶ 1.)   Plaintiff filed the operative First Amended

15   Complaint ("FAC") on June 27, 2025 asserting five claims for relief: (1) recission under New

16   York common law; (2) unjust enrichment under New York common law; (3) declaratory relief

17   under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57; (4) unfair and deceptive

18   business practices under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§

19   1750, *et seq.*; and (5) unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*   (FAC,

20   Dkt. No. 14 at 13-23.)

21

22   \\

23   \\

24

25   [7] Plaintiff initially brought this action against ClassPass, Inc., Mindbody, Inc., Vista Equity Partners Management, LLC,

26   ClassPass, LLC, and ClassPass USA LLC.   (*See* FAC, Dkt. No. 14 ¶¶ 4-8.)   "ClassPass, Inc. was terminated on October 15, 2021" and succeeded by ClassPass, LLC.   (*See* Dkt. No. 17.)   "ClassPass USA LLC's parent company is ClassPass, LLC"

27   and "ClassPass, LLC's parent company is MINDBODY, Inc."   (*Id.*)   "MINDBODY, Inc.'s parent company is Torreys Parent, LLC, whose parent company is Torreys Topco, Inc., whose parent company is VEPF Torreys Aggregator, LLC."   (*Id.*) The

28   parties stipulated to dismiss Defendant Vista Equity Partners Management, LLC on July 17, 2025.   (Dkt. No. 25.)   As such, the remaining Defendants in this matter are ClassPass LLC, ClassPass USA LLC, and Mindbody, Inc.

1

## LEGAL STANDARDS

2

3    ### I.    <u>Federal Arbitration Act</u>

4

5    The Federal Arbitration Act ("FAA") "sets forth procedures for enforcing arbitration

6    agreements in federal court." *Smith v. Spizzirri*, 601 U.S. 472, 473 (2024). "By its terms, the

7    [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that

8    district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration

9    agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) "The

10   court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement

11   to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."

12   *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citing 9 U.S.C. §

13   4). "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests

14   a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith*, 601

15   U.S. at 478 (citing 9 U.S.C. § 3).

16

17   ### II.    <u>Choice of Law</u>

18

19   "When deciding whether the parties agreed to arbitrate a certain matter (including

20   arbitrability), courts generally . . . apply ordinary state-law principles that govern the formation

21   of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the

22   applicable state law would be that of either California[8] or New York[9]. However, the Court "need

23   not decide whether to apply California or New York law as the end result will be the same."

24

25   ---

     [8] "Federal courts sitting in diversity look to the law of the forum state—here, California—when making choice of law

26   determinations." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *Hoffman v. Citibank, N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam)).
     [9] Both the 2021 and 2024 Terms of Use contain a choice of law provision stating that "[t]hese Terms shall be governed in all

27   respects by the laws of the State of New York, without regard to conflict of law provisions, consistent with the Federal Arbitration Act (to the extent permitted by applicable law)." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 19(a); Ex. B §

28   19(a).) But "whether the choice of law provision applies depends on whether the parties agreed to be bound by [ClassPass's] Terms of Use in the first place." *Nguyen*, 763 F.3d at 1175.

*Chabolla v. Classpass Inc.*, No. 4:23-cv-00429-YGR, 2023 U.S. Dist. LEXIS 122616, at *6-7 (N.D. Cal. June 22, 2023), *aff'd*, 129 F.4th 1147 (9th Cir. 2025) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). This is because "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Berman*, 30 F.4th 855 (quotation and citation omitted).

### III.    California and New York Contract Law

"Online contracts are subject to the same elemental principles of contract formation as paper contracts." *Chabolla v. Classpass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). "To form a contract under New York or California law, the parties must manifest their mutual assent to the terms of the agreement." *Berman*, 30 F.4th at 855. Although a party may manifest assent through conduct, "[t]he conduct of a party is not effective as a manifestation of [] assent unless [the party] intends to engage in the conduct and knows or has reason to know that the other party may infer from [the] conduct that [the party] assents." *Berman*, 30 F.4th at 855 (quoting Restatement (Second) of Contracts § 19(2) (1981)); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024).

### DISCUSSION

### I.    Validity of the Arbitration Agreement

#### A.    Notice and Assent

"Because ClassPass's website provides a link to the Terms of Use but does not require that the user actually read them before moving on to purchase a subscription, the website most closely resembles a 'sign-in wrap agreement.'" *Chabolla*, 129 F.4th at 1154 (quoting *Keebaugh*, 100 F.4th at 1014). "Like all online contracts, 'a sign-in wrap agreement may be an enforceable

contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Id.* (quoting *Keebaugh*, 100 F.4th at 1014).

### 1.  2021 Terms of Use

Defendants assert that ClassPass "conspicuously notified Plaintiff of the 2021 Terms when she signed up for her ClassPass free trial on November 15, 2021." (Dkt. No. 29-1 at 10.) More specifically, Defendants argue that "[t]he 2021 Terms were conspicuously presented to Plaintiff with offset, hyperlinked text where Plaintiff could review the 2021 Terms for as long as she liked before signing up for ClassPass's free trial membership." (*Id.*)  Defendants also aver that the sign-up flow that Plaintiff followed to sign up for her ClassPass free trial in November 2021 meets the standard for conspicuous notice outlined by the Ninth Circuit in *Chabolla v. ClassPass Inc.* because "Plaintiff was 'explicitly advised that the act of clicking' the 'Start your free trial' button would 'constitute assent to' the 2021 Terms." (*Id.* at 11 (quoting *Chabolla*, 129 F.4th at 1152-53).)  Thus, Defendants maintain that "Plaintiff first agreed to arbitrate her claims and waive her right to bring a class action in November 2021." (*Id.* at 12.)

Plaintiff counters that the free trial sign-up flow she encountered in 2021 contained several fatal defects.  First, Plaintiff argues that the notice on Plaintiff's Screen 1 "explicitly limited terms acceptance to social media sign-ups, providing no notice whatsoever for email users like Ms. Majidi-Ahy."  (Dkt. No. 30 at 17.)  Next, Plaintiff contends that "Screens 2 through 4 failed to cure the initial lack of notice" because Screen 2 only contained "small hyperlinked text at the bottom reading 'Terms | Privacy Policy' . . . [with] no indication that clicking 'Continue' would constitute agreement[,]" and "Screens 3 and 4 contained no reference to terms at all." (*Id.*)  Lastly, Plaintiff asserts that on Screen 5, the "Start your free trial" button and small notice reading that "By clicking the button below you agree to the Terms . . ." did not

provide sufficient notice that Plaintiff would be bound by the 2021 Terms of Use and failed to cure the lack of notice in the prior four screens. (*Id.* at 18.) Thus, Plaintiffs argues that the multi-screen sign-up flow presented to her did not provide her with valid notice of the 2021 Terms of Use. (*Id.*)

"To be conspicuous, notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 856). This inquiry is both context- and fact-specific. *See Chabolla*, 129 F.4th at 1155; *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 514-16 (9th Cir. 2023); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021).

Here, the Court agrees that there was insufficient notice of the terms in Screens 1 through 4 of the sign-up flow because those screens were either completely silent or unclear as to whether the terms applied to those signing up for a free trial via email. (*See* Teng Decl. ¶¶ 4-7, Exs. A-D.) Nevertheless, the Court finds that the final screen *did* provide sufficient notice for Plaintiff to assent to the 2021 Terms of Use. (*See id.* ¶ 8, Ex. E.)

On the final payment screen, Plaintiff was presented with the following language above the blue "Start your free trial button": "By clicking the button below, you agree to the Terms, and your 14 days 20-credit trial will begin." (*Id.*) As the Ninth Circuit noted in *Oberstein*, such language "clearly denotes 'that continued use will act as a manifestation of the user's intent to be bound.'" *Oberstein*, 60 F.4th at 516 (quoting *Nguyen*, 763 F.3d at 1177); *see also Berman* 30 F.4th at 858 ((*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78-80 (2d Cir. 2017)) ("[The] notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the Terms & Conditions.'"). Likewise, the hyperlink of the 2021 Terms of Use being "conspicuously distinguished from the surrounding text in bright blue font [made] its presence readily apparent." *Id.* at 516-17 (citing *Berman* and Sellers) ("In contrast with the agreements invalidated in *Berman* and *Sellers*, the Terms here were marked in bright blue font

and distinguished from the rest of the text.").  Furthermore, "the context of this transaction, requiring a full registration process, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 517 (quoting *Sellers*, 73 Cal. App. 5th at 477).

For these reasons, the Court finds that the ClassPass free trial sign-up flow provided Plaintiff with adequate notice of the 2021 Terms of Use and that Plaintiff unambiguously manifested her assent to these terms, including the arbitration provisions.

### ii.    2024 Terms of Use

Next, Defendants assert that Plaintiff also assented to the 2024 Terms of Use.  (Dkt. No. 29-1 at 12.)  Defendants argue that "[i]n addition to the assent she provided at the conclusion of her original sign-up process, Plaintiff has repeatedly and decisively manifested her assent to be bound by the 2024 Terms through the email notification she received on August 10, 2024 and her continued use of ClassPass." (*Id.* at 13.)

Defendants further assert that Plaintiff assented to the 2024 Terms of Use because on August 11, 2024, Plaintiff twice clicked the "I agree" button on the "in-app, popup notice that informed her that ClassPass had 'updated [its] Terms of Use' and that the 'changes include[d] an updated arbitration agreement.'" (*Id.* at 14 (quoting Chang Decl., Dkt. No 29-2 ¶ 4, 6).) Defendants emphasize that the "pop-up stated, 'Please stay informed by reviewing the updated Terms of Use,' with the blue, underlined text 'Terms of Use' hyperlinked to redirect a user who clicked on it to the 2024 Terms . . . ." (*Id.* (quoting Chang Decl., Dkt. No. 29-2 ¶¶ 4-5).) Defendants also underscore that "Plaintiff was informed by the pop-up window that "[b]y using [her] ClassPass account, [ClassPass's] website, or mobile app, [she was] agreeing to the updated Terms of Use.'" (*Id.* (quoting Chang Decl., Dkt. No. 29-2 ¶¶ 4-5).)

Plaintiff contends that "ClassPass's August 2024 pop-up cannot save its motion because one cannot 'update' an arbitration agreement that never validly existed." (Dkt. No. 30 at 18.) Plaintiff maintains that "[e]ven assuming arguendo that ClassPass could create an arbitration agreement through unilateral modification, the August 2024 pop-up fails" because "generic notices about updated arbitration terms cannot retroactively apply to already accrued claims." (*Id.* (citing *Ash v. Axos Bank*, No. 24-cv-1157-RSH-BJC, 2024 U.S. Dist. LEXIS 165664 (S.D. Cal. Sep. 13, 2024)).

Plaintiff identifies two primary issues with the pop-up. "First, it stated only that 'Key changes include an updated arbitration agreement with more specific dispute resolution procedures' but said nothing about applying to Ms. Majidi-Ahy's existing penalty fee claims." (*Id.* at 19 (quoting Chang Decl., Dkt. No. 29-1 ¶¶ 3-6).) "Second, the pop-up stated 'By using your ClassPass account, our website, or mobile app, you are agreeing to the updated Terms'—binding users through mere continued use regardless of clicking 'I agree.'" and providing users with "no option to decline short of abandoning their accounts and forfeiting paid credits." (*Id.* (quoting Chang Decl., Dkt. No. 29-1 ¶¶ 3-6).) Thus, Plaintiff maintains she did not assent to the 2024 Terms of Use. (*Id.*)

The Court finds that Plaintiff had notice of, and unambiguously assented to, ClassPass's 2024 Terms of Use. Plaintiff received notice of the 2024 Terms of Use via the August 10, 2024 email and August 11, 2024 in-app pop-up, both of which included blue hyperlinks to the actual terms. (*See* Chang Decl., Dkt. No. 29-2 ¶¶ 3-6.) The August 11, 2024 pop-up noted that "[k]ey changes [to the terms] include an updated arbitration agreement with more specific dispute resolution procedures" and admonished users to "[p]lease stay informed by reviewing the updated Terms of Use," which were hyperlinked in blue. (*Id.* ¶ 4.) The fact that the pop-up did not outline specific modifications to the terms is of no consequence. *See Holl v. United States Dist. Court (In re Holl)*, 925 F.3d 1076, 1083 (9th Cir. 2019) ("There is no special rule, however, that an offeror of an adhesive consumer contract specifically highlight or otherwise bring an

1    arbitration clause to the attention of the consumer to render the clause enforceable."); *Plaintiffs*

2    *v. UPS Defendants*, No. 2:21-cv-08446-MCS-E, 2022 U.S. Dist. LEXIS 211640, at *13-14

3    (C.D. Cal. Nov. 21, 2022) ("[Plaintiffs] had inquiry notice of the updated term by virtue of their

4    assent to the pop-up providing notice of the update.  To hold otherwise would require any service

5    provider or website host seeking to bind a consumer or user to new terms of use to publish a

6    redline version of the terms any time an amendment is made.").

7

8        Moreover, Plaintiff demonstrated her assent to the 2024 Terms of Use through her

9    acceptance of the terms via the pop-up in the ClassPass app on August 11, 2024.  (*See* Chang

10   Decl., Dkt. No. 29-2 ¶ 6.)  *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12

11   (N.D. Cal. 2011) ("Because Plaintiff was provided with an opportunity to review the terms of

12   service in the form of a hyperlink immediately under the 'I accept' button and she admittedly

13   clicked 'Accept,' . . . a binding contract was created here. . . ."); *Perry v. MLB Advanced Media,*

14   *L.P.*, No. CV 18-1548 PSG (GJSx), 2018 U.S. Dist. LEXIS 239692, at *6-7 (C.D. Cal. May 30,

15   2018) (collecting cases supporting the conclusion that Plaintiff accepted terms of use containing

16   an arbitration provision by clicking a "Buy & Accept Terms" button located immediately above

17   a hyperlink that directed Plaintiff to Defendant's Terms of Use).  Likewise, Plaintiff's continued

18   use of ClassPass's services demonstrated her assent to the 2024 Terms of Use because the pop-

19   up specified that "[b]y using your ClassPass account, our website, or mobile app, you are

20   agreeing to the updated Terms of Use."  (*Id.* ¶ 4; *see* Doremus Decl., Dkt. No. 20-3 ¶¶ 3-5.)  *See*

21   *Berman*, 30 F.4th 857-58 (quoting *Nguyen*, 763 F.3d at 1177) ("The presence of 'an explicit

22   textual notice that continued use will act as a manifestation of the user's intent to be bound' is

23   critical to the enforceability of any browsewrap-type agreement.")

24

25       For these reasons, the Court finds that Defendants have demonstrated Plaintiff's notice

26   of and assent to the 2024 Terms of Use, including the Arbitration Agreement.

27

28   \\

1

2

### B.    Substantive Unconscionability

3

4    The FAA "permits arbitration agreements to be declared unenforceable 'upon such

5    grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v.*

6    *Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2).  "This saving clause permits

7    agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud,

8    duress, or unconscionability . . . ."  *Id.*  Under California law, "[s]ubstantive unconscionability

9    pertains to the fairness of an agreement's actual terms and to assessments of whether they are

10    overly harsh or one-sided."  *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,

11    55 Cal. 4th 223, 246 (2012).  "The party resisting arbitration bears the burden of proving

12    unconscionability." *Id.* at 247.

13    Plaintiff contests the validity of the arbitration agreement by asserting that under

14    California law, "an arbitration agreement that allows one party to unilaterally modify it

15    retroactively is illusory and unenforceable."  (Dkt. No. 30 at 12.)  Plaintiff argues that the

16    agreement's language stating that the agreement applies to "ANY AND ALL DISPUTES  . . .

17    WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR OMISSIONS IN THE

18    PAST OR IN THE FUTURE" improperly allows "retroactive modification to already-accrued

19    claims."  (*Id.* at 13 (quoting Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a)) (citing *Peleg v.*

20    *Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425 (2012) and *Peng v. First Republic Bank*, 219

21    Cal. App. 4th 1462, 1473-74 (2013)).)  Additionally, Plaintiff argues that the provision grants

22    "ClassPass reserved unlimited power to 'amend the Terms from time to time' with mere

23    continued use of the service constituting acceptance-no actual notice to users required."  (*Id.* at

24    13-14 (quoting Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 1(b)).)  Because these provisions

25    allow ClassPass to " silently modify its arbitration agreement at any time and apply those

26    modifications retroactively to past disputes," the Arbitration Agreement is therefore "illusory."

27    (*Id.* at 14.)

28

14

Defendants contend that "Plaintiff's argument mischaracterizes the Terms, insisting they are 'unilateral'" when "[t]o the contrary, the Terms are bilateral." (Dkt. No. 35 at 7 (citing *Trudeau v. Google LLC*, 816 Fed. App'x 68, 70 (9th Cir. 2020).) Defendants assert that the Terms of Use and Arbitration Agreement require bilateral agreement because "[b]oth the 2021 and 2024 Terms required affirmative acceptance," and "[i]f a ClassPass user stops using ClassPass, does not click any buttons to indicate their consent, and otherwise does not outwardly indicate their consent, they will not be bound by any further updates to the Terms." (*Id.*) Additionally, "[u]nder the Terms, ClassPass would only be able to change the Arbitration Agreement after a dispute arose if the relevant user assented to the change." (*Id.*) Lastly, Defendants maintain that "regardless of the Terms language, there was bilateral agreement here" because "Plaintiff affirmatively assented to the 2021 Terms by completing her sign-up flow and to the 2024 Terms by, among other actions, clicking 'I agree' twice when given actual notice that ClassPass had amended its Terms 'includ[ing] an updated arbitration agreement.'" (*Id.* at 7-8 (citing Teng Decl., Dkt. No. 29-4 ¶¶ 8-9, Ex. E and Chang Decl., Dkt. No. 29-2 ¶¶ 4-6.).)

In *Peleg*, the California Court of Appeal held that "in applying the FAA under California contract law, the covenant of good faith and fair dealing may save an arbitration agreement from being illusory notwithstanding the absence of an express savings clause." 140 Cal. Rptr. 3d 38, 67. The court found that "[a] unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known, is impliedly restricted by the covenant [of good faith and fair dealing] so that changes do not apply to such claims." *Id.* The court further found that "[a]n arbitration agreement that expressly exempts all claims, accrued or known, from contract changes is valid and enforceable without resort to the covenant [of good faith and fair dealing]." *Id.* at 68. Lastly, the court found that if "an arbitration agreement expressly applies a contract change to such claims, the covenant cannot vary the plain language, and the agreement is illusory." *Id.*

\\

1    In *Peng*, the California Court of Appeal held that the implied covenant of good faith and

2   fair dealing "prevents [a party] from modifying an arbitration agreement once a claim has

3   accrued or become known to it." 219 Cal. App. 4th at 1474.  Accordingly, the court concluded

4   that the unilateral modification provision in question was not substantively unconscionable

5   because the provision stating that defendant could only modify the agreement at will rather than

6   terminate it was "so one-sided as to shock the conscience."  *Id.* (quoting *24 Hour Fitness, Inc.*

7   *v. Superior Court*, 66 Cal. App. 4th 1199, 1204 (1998)).

8

9    Here, the Court finds that *Peleg* and *Peng* are inapposite because the 2024 Terms of Use

10  were adopted by bilateral agreement between Plaintiff and ClassPass.  Plaintiff received notice

11  of the modified terms via email and in-app pop-up and affirmatively accepted the terms via her

12  clicking the "I accept" button on the pop-up and her continued use of ClassPass's services.  *See*

13  *Trudeau v. Google LLC*, 816 F. App'x 68, 70, n.1 (9th Cir. 2020) (finding that the Terms of

14  Service "were adopted by bilateral agreement" between Plaintiff and Google because "Google

15  gave [Plaintiff] notice of the new terms and he affirmatively accepted them"); *Azeveda v.*

16  *Comcast Cable Communs. LLC*, No. 5:19-cv-01225-EJD, 2019 U.S. Dist. LEXIS 177765, at

17  *17 n.5 (N.D. Cal. Oct. 11, 2019) (finding *Peleg* "inapplicable" because "Defendants notified

18  employees of the proposed changes and allowed them a reasonable opportunity to opt-out of the

19  changes").  Therefore, *Peleg* and *Peng*, which concern the impact of *unilateral* modification

20  provisions, are not applicable.

21

22   Moreover, the mere fact that the Arbitration Agreement applies to "ANY AND ALL

23  DISPUTES  . . . WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR

24  OMISSIONS IN THE PAST OR IN THE FUTURE" does not necessarily render the agreement

25  invalid.  (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a).)  In fact, "[t]he Ninth Circuit

26  consistently upholds the enforceability of the retroactivity of arbitration clauses."  *See Saucedo*

27  *v. Experian Info. Sols., Inc.*, No. 1:22-cv-01584-ADA-HBK, 2023 U.S. Dist. LEXIS 127644, at

28  *19-20 (E.D. Cal. July 24, 2023) (collecting cases).  And again, Plaintiff received notice of the

2024 Terms of Use, including the Arbitration Agreement and retroactive provision, and still affirmatively assented.  Thus, the 2024 Terms of Use and included Arbitration Agreement are valid and binding on Plaintiff.

### C.    Public Injunctive Relief

Next, Plaintiff argues that "[e]ven if an arbitration agreement existed . . . and were enforceable . . . , Ms. Majidi-Ahy's claims for public injunctive relief should remain in court" because Ms. Majidi-Ahy seeks "forward-looking, public-benefiting relief that . . . cannot be waived."  (Dkt. No. 30 at 25 (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017)).) Defendants counter that "*McGill* is inapposite" because "the Arbitration Agreement does not require users to waive their right to seek public injunctive relief" and "*McGill* does not prohibit arbitrating claims for public injunctive relief."  (Dkt. No. 35 at 11.)

"A public injunction is a form of 'injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.'"  *McBurnie v. RAC Acceptance E., LLC*, 95 F.4th 1188, 1191 (9th Cir. 2024) (quoting *McGill*, 2 Cal. 5th at 951). In *McGill*, the California Supreme Court held that "an agreement to waive the right to seek public injunctive relief violates California Civil Code § 3513, which provides that 'a law established for a public reason cannot be contravened by a private agreement.'"  *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 824 (9th Cir. 2019) (quoting *McGill*, 2 Cal. 5th at 961).  In other words, "California's *McGill* rule invalidates contractual agreements that waive the right to seek" public injunctions.  *Id.* at 1190 (citing *McGill*, 2 Cal. 5th at 961-62); *see also Patrick*, 93 F.4th at 477-78 (citing *McGill*, 2 Cal. 5th at 961-62) ("Under California law, a clause prohibiting a party from seeking public injunctive relief is invalid and unenforceable.").  Notably, the "FAA does not preempt the *McGill* rule.  *Blair*, 928 F.3d at 831.

\\

17

Here, the Arbitration Agreement provides that "[t]he arbitrator may award on an individual basis any relief that would be available pursuant to applicable law, and will not have the power to award relief to, against or for the benefit of any person who is not a party to the proceeding." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(d).)  This provision precludes the arbitrator from awarding public injunctive relief and thus waives Plaintiff's right to seek a public injunction "in any forum." *McGill*, 2 Cal. 5th at 953.  Thus, in accordance with the *McGill* rule, this provision is invalid.  Nevertheless, the Court finds that the Arbitration Agreement, as a whole, is not void and unenforceable under *McGill* because of the Agreement's severability clause.

The Arbitration Agreement's severability clause provides that "[i]f any clause within this Arbitration Agreement, other than the Class Action Waiver clause[10] above, is found to be illegal or unenforceable, that clause will be severed from this Arbitration Agreement, and the remainder of this Arbitration Agreement will be given full force and effect." (*Id.* § 18(k).)  On its face, this severability clause allows for the provision precluding the arbitrator from awarding public injunctive relief to be severed from the Arbitration Agreement and for the remainder of the Arbitration Agreement to remain in effect.  *See Jialu Wu v. iTalk Glob. Communs., Inc.*, No. CV 20-7150 PSG (PJWx), 2020 U.S. Dist. LEXIS 250121, at *23 (C.D. Cal. Oct. 21, 2020) (finding the arbitration agreement unenforceable only "to the extent that it required [the plaintiff] to waive his right to seek a public injunction").

Therefore, even if all of Plaintiff's disputes are encompassed by the Arbitration Agreement and must be arbitrated, any claims for public injunctive relief shall remain before

---

[10] The Arbitration Agreement also contains a Class Action Waiver that provides: "Any Disputes . . . shall be submitted individually by you and will not be subject to any class action or representative status." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(i).)  That the Class Action Waiver provision is non-severable is of no consequence to Plaintiff's ability to seek public injunctive relief because under California law, "[a]n individual claim seeking a public injunctive relief remedy is not a class or representative claim." *Dornaus v. Best Buy Co., Inc.*, No. 18-cv-04085-PJH, 2019 U.S. Dist. LEXIS 24522, at *16 n.2 (N.D. Cal. Feb. 14, 2019)  (*McGill*, 2 Cal. 5th at 959); *Blair*, 928 F.3d at 829 (quoting *Concepcion*, 563 U.S. at 348) ("Nothing in the *McGill* rule requires a 'switch from bilateral . . . arbitration' to a multi-party action.").

this Court. *See id.* (finding that because "the Agreement, as a whole, is not unenforceable under *McGill*[,] . . . all of Plaintiff's claims for relief except his claim for a public injunction must be arbitrated if the Agreement encompasses the dispute at issue"); *Blair*, 928 F.3d at 832 (affirming the district court's order that referred the arbitrable claims to arbitration and declined to stay the non-arbitrable claims); *McGill*, 2 Cal. 5th at 966 (finding that when there is an invalid provision waiving the right to seek a public injunction, a court may send the arbitrable claims to arbitration while retaining jurisdiction over the public injunction claim).

## II.  <u>Scope of the Arbitration Agreement</u>

### A.  Arbitrability of Plaintiff's Claims

With the Court finding that Plaintiff assented to the 2021 and 2024 Terms of Use, the Court must next decide whether the Court or the arbitrator should determine the threshold question of arbitrability.

Parties can agree to expressly delegate gateway issues, including whether the arbitration agreement encompasses the dispute at issue, to an arbitrator. *Morgan v. Glob. Payments Check Servs.*, No. 2:17-cv-01771-JAM-CMK, 2018 U.S. Dist. LEXIS 25335, at *4-5 (E.D. Cal. Feb. 14, 2018). "[U]nlike the arbitrability of claims in general, whether the court or the arbitrator decides arbitrability is 'an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise.*'" *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "Clear and unmistakable evidence of an agreement to arbitrate arbitrability 'might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so.'" *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)).

1    Here, the Arbitration Agreement in the 2024 Terms of Use provides that "[a]ll issues

2    shall be for the arbitrator to decide, including the scope of this Arbitration Agreement." (Van

3    Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(c)).) "This language, as drafted, meets the requisite

4    'clear and unmistakable' standard, and the Court therefore may not override the parties' choice

5    to delegate questions of arbitrability to the arbitrator." *Dickey v. Ticketmaster LLC*, No. CV 18-

6    9052-GW(GJSx), 2019 U.S. Dist. LEXIS 231895, at *23 (C.D. Cal. Mar. 12, 2019) (finding that

7    a provision that "[t]he arbitrator . . . shall have exclusive authority to the extent permitted by law

8    to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability

9    or formation of this Agreement . . ." met the clear and unmistakable standard).

10

11    Likewise, the provision in the Arbitration Agreement that "JAMS . . . will arbitrate all

12    Disputes, and the arbitration will be conducted before a single arbitrator" constitutes clear and

13    unmistakable evidence that the parties agree to arbitrate arbitrability. (Van Meter Decl., Dkt.

14    No. 29-5 ¶ 4, Ex. B § 18(c)).) *See Patrick v. Running Warehouse, LLC*, No. 2:21-cv-09978-

15    ODW (JEMx), 2022 U.S. Dist. LEXIS 190483, at *12 (C.D. Cal. Oct. 18, 2022), *aff'd*, 93 F.4th

16    468, 481 (9th Cir. 2024) ("By agreeing to an arbitration provision that incorporates JAMS Rules,

17    and particularly in light of the language of JAMS Rule 11(b), [which expressly delegates

18    arbitrability to the arbitrator,] the Court finds that the parties clearly and unmistakably

19    delegated the question of arbitrability to JAMS.").

20

21    For these reasons, this Court "possesses no power to decide the arbitrability issue" and

22    "may not override" the delegation provision of the Arbitration Agreement. *Henry Schein, Inc.*,

23    586 U.S. at 68. The Court therefore concludes that the Arbitration Agreement, which extends

24    broadly to "any dispute, claim, or controversy between you and ClassPass Releasees regarding

25    any aspect of your relationship with ClassPass Releasees, . . . and includes the validity,

26    enforceability or scope of this Arbitration Agreement," covers the disputes at issue in this action,

27    except for any claims for public injunctive relief. (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B §

28    18(a).) *See Brennan*, 796 F.3d at 1130. Therefore, the Court must now determine which of

Plaintiff's claims, if any, seek public injunctive relief and are thus not subject to the provisions of the Arbitration Agreement.

In the FAC, Plaintiff "seeks injunctive relief to stop ClassPass from imposing unlawful penalty fees on all future subscribers" under California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code, § 17200 *et seq.* (Dkt. No. 30 at 25 (citing FAC, Dkt. No. 14 ¶¶ 89-95).) But "[m]erely declaring that a claim seeks a public injunction . . . is not sufficient to bring that claim within the bounds of the rule set forth in *McGill*." *Blair v. Rent-A-Center, Inc.*, No. C 17-02335 WHA, 2017 U.S. Dist. LEXIS 163979, at *6 (N.D. Cal. Oct. 3, 2017), *aff'd*, 928 F.3d 819 (9th Cir. 2019). "Rather, *McGill* limited invalidity to claims which confer by statute the right to seek a public injunction." *Id.* at *6-7. To determine whether a statute provides for public injunctive relief, *McGill* considered "whether it has a public purpose, and, in turn, whether, in crafting the law, the California legislature provided that a private individual could seek an injunction that would 'by and large benefit[] the general public and [] benefit[] the plaintiff, if at all, only incidentally and/or as a member of the general public.'" *Id.* at *7 (quoting *McGill*, 2 Cal. 5th at 955).

In *McGill*, the California Supreme Court found that because public injunctive relief available under the UCL is primarily for the benefit of the general public, waiver of the right to seek public injunctive relief under the UCL are invalid and unenforceable under California law. *See* 2 Cal. 5th at 961. As Plaintiff's fifth claim seeks public injunctive relief under the UCL, the Court therefore concludes that the Arbitration Agreement is unenforceable as to that claim. Thus, this Court "shall retain jurisdiction over the adjudication of plaintiff's request for public injunctive relief" in her fifth claim. *Dornaus v. Best Buy Co., Inc.*, No. 18-cv-04085-PJH, 2019 U.S. Dist. LEXIS 24522, at *16 (N.D. Cal. Feb. 14, 2019) ("While the remainder of plaintiff's action must be compelled to arbitration under the terms of the Agreement—including all questions of liability—the court shall retain jurisdiction over the adjudication of plaintiff's request for public injunctive relief, should defendant be found liable for the California statutory

21

claims, which are brought on behalf of the public and for which public injunctive relief may be available.").

### B. Application of the Arbitration Agreement to Mindbody

Plaintiff argues that "[e]ven if ClassPass could establish a valid arbitration agreement . . . , MINDBODY cannot enforce it" because "MINDBODY is not a party to any arbitration agreement with Ms. Majidi-Ahy. (Dkt. No. 30 at 20.) According to Plaintiff, "MINDBODY fails to establish it can compel arbitration on three independent grounds: the plain language of the Terms does not grant MINDBODY arbitration rights, MINDBODY is not a third-party beneficiary, and equitable estoppel does not apply." (*Id.*)

First, Plaintiff argues that Defendants' reliance on *Meeks v. Experian Info. Servs., Inc.*, Nos. 21-17023, 22-15028, 2022 U.S. App. LEXIS 35650 (9th Cir. Dec. 27, 2022) is misguided because the facts in that case are distinguishable from the facts at hand. (*Id.*) Plaintiff states that "[i]n Meeks, the Ninth Circuit held that Experian could compel arbitration because 'Experian was an affiliate at the time the contract was formed and that it plays a role in the larger agreement.'" (*Id.* (quoting *Meeks*, 2022 U.S. App. LEXIS 35650, at *6.) But here, "MINDBODY is never identified by name anywhere in the 2024 Terms or in any marketing materials Plaintiff can recall" and "MINDBODY plays no disclosed role in the consumer-facing relationship." (*Id.* at 21.)

Second, Plaintiff argues that Mindbody is not a third-party beneficiary because "[n]othing in the Terms disclosed MINDBODY's existence, role, or relationship to ClassPass." (*Id.* at 23.) Plaintiff asserts that "[t]he failure to identify MINDBODY by name or specific role demonstrates the absence of any motivating purpose to benefit it." (*Id.* at 22-23.) Further, Plaintiff avers that "permitting MINDBODY to enforce the arbitration provision is inconsistent with the reasonable expectations of the contracting parties." (*Id.* at 23 (quotation omitted).)

Finally, Plaintiff argues that MINDBODY cannot invoke equitable estoppel because Plaintiff "does not rely on any provision of the Terms to establish her rights or remedies." (*Id.*) "To the contrary, she challenges the Terms as containing an unlawful penalty provision." (*Id.*)

Defendants counter that "[t]he Opposition fails to distinguish between the three ClassPass Defendant entities and refers to them collectively throughout." (Dkt. No. 35 at 11.) Thus, Defendants assert that "[i]t is left uncontested that all three ClassPass entities may enforce the Arbitration Agreement, and Plaintiff has waived any contrary argument." (*Id.*)

Nonetheless, Defendants argue that the plain language of the 2024 Terms of Use extend to Mindbody because "the Arbitration Agreement applies to both 'PARENTS' and 'AFFILIATED ENTITIES' of ClassPass USA LLC and therefore identifies Mindbody by its role." (Dkt. No. 35 at 12 (quoting Van Meter Decl., Dkt. No. 29-5, Ex. B § 9(k)).) Defendants assert that "Plaintiff cannot rewrite this language, and *Meeks* provides her with no support" because "[w]hat was truly critical to *Meeks* was that the agreement at issue there bound the 'plaintiffs to arbitrate with ECS and define[d] ECS to include 'affiliates,' and Experian [was] an affiliate.'" (*Id.* (quoting *Meeks*, 2022 U.S. App. LEXIS 35650, at *6).)

Next, Defendants argue that Mindbody is a third-party beneficiary, and "[t]he fact that Plaintiff did not know who ClassPass's 'PARENTS' and 'AFFILIATED ENTITIES' were when agreeing to the 2024 Terms, does not negate the fact that she agreed to arbitrate her claims against ClassPass's 'PARENTS' and 'AFFILIATED ENTITIES.'" (*Id.* at 13.)

Lastly, Defendants contend that "Plaintiff's very first cause of action is for rescission and restitution under New York contract law . . . [, a]nd Plaintiff's own count for rescission and restitution alleges that '[a] valid contract existed between ClassPass and each Class member'— including Plaintiff—and that 'Plaintiff and the Class fully performed their material

23

obligations.'" (*Id.* at 13-14 ( quoting FAC, Dkt. No. 14 ¶¶ 53-54).) "Because Plaintiff's claims are intimately founded in and intertwined with the underlying contract obligations, she is equitably estopped from avoiding arbitration against Mindbody." (*Id.* at 14 (quotation omitted).)

"[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). "In California, a court may find a nonsignatory bound to an arbitration agreement under six doctrines: '(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary.'" *Faucett v. Move, Inc.*, No. 2:22-cv-04948-ODW (ASx), 2024 U.S. Dist. LEXIS 73094, at *8-9 (C.D. Cal. Apr. 18, 2024) (quoting *Benaroya v. Willis*, 23 Cal. App. 5th 462, 469 (2018).

"A third party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit." *Matthau v. Superior Ct.*, 151 Cal. App. 4th 593, 602 (2007). Under the equitable estoppel doctrine, "a signatory to an agreement with an arbitration clause cannot . . . on the one hand, seek to hold [a] non-signatory liable pursuant to duties imposed by the agreement . . . [while] on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 220 (2009)

In *Meeks*, the Ninth Circuit considered whether a nonsignatory defendant, Experian, could "enforce an arbitration provision in a larger agreement that the plaintiffs entered into when they signed up for credit-monitoring services provided primarily by Experian's sister company, Experian Consumer Services (ECS)." *Meeks*, 2022 U.S. App. LEXIS 35650, at *2. The court noted that although "[t]he text of the arbitration provision binds the plaintiffs and ECS to arbitrate certain disputes and defines ECS to include affiliates, [] the larger agreement does not define ECS to include affiliates." *Id.*

The Ninth Circuit concluded that "there is sufficient evidence that Experian sought to be bound by the arbitration provision" because "[t]he text of the arbitration provision binds plaintiffs to arbitrate with ECS and defines ECS to include 'affiliates.'" *Id.* at *6.  Because "Experian is an affiliate and was so when the plaintiffs entered into the agreement," the Ninth Circuit reversed the district court's denial of Experian's initial motion to compel arbitration and held that Experian is a party to the arbitration agreement. *Id.* at *6-7.

Here, the 2024 Terms of Use provide that "THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT REQUIRE YOU TO ARBITRATE ALL DISPUTES YOU HAVE WITH CLASSPASS RELEASEES ON AN INDIVIDUAL BASIS." (Van Meter Decl., Dkt. No. 29-5, Ex. B.)  Likewise, Section 18 of the 2024 Terms of Use provides that the "Arbitration Agreement facilitates the prompt and efficient resolution of any disputes that may arise between you and ClassPass Releasees." (*Id.* § 18(a).) Releasees are defined as "CLASSPASS, ITS PARENTS, SUBSIDIARIES, AND AFFILIATED ENTITIES . . . ." (*Id.* § 9(k).)  Notably, Mindbody acquired ClassPass and became its parent company on October 15, 2021. (*See* Dkt. No. 17; Chang Decl., Dkt. No. 29-2 ¶ 1; Teng Decl., Dkt. No. 29-4 ¶ 1; Van Meter Decl., Dkt. No. 29-5 ¶¶ 1, 6-7.)

Applying the logic of *Meeks*, the Court finds there is sufficient evidence that the Arbitration Agreement extends to Mindbody.  The text of the Arbitration Agreement binds Plaintiff to arbitrate with ClassPass and its Parents.  Because Mindbody is the parent company to ClassPass and was so at the time Plaintiff first signed up for ClassPass in November 2021, the Court readily concludes that Mindbody is a party to the Arbitration Agreement. (*See* Van Meter Decl., Dkt. No. 29-5 ¶¶ 1, 6-7, Ex. B § 9(k); Chang Decl., Dkt. No. 29-2 ¶ 1; Teng Decl., Dkt. No. 29-4 ¶ 1; Dkt. No. 17.)  *See Meeks*, 2022 U.S. App. LEXIS 35650, at *6.  As such, Plaintiff's claims against Mindbody that do not seek public injunctive relief must proceed to arbitration.

Given the Court's conclusion that Mindbody can enforce the Arbitration Agreement as a party, the Court need not address Plaintiff's third-party-beneficiary or equitable estoppel arguments. *Meeks*, 2022 U.S. App. LEXIS 35650, at *2 n.1. Additionally, Plaintiff's request that the Court stay the arbitration until the resolution of Plaintiff's litigation against Mindbody should the Court be inclined to compel arbitration with ClassPass is denied as moot. (Dkt. No. 30 at 24.)

### III.    **Necessity of a Stay**

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith*, 601 U.S. at 478 (citing 9 U.S.C. § 3). Accordingly, this case, as it pertains to Plaintiff's claims that do not seek public injunctive relief, must be stayed. *See* 9 U.S.C. § 3. However, "[g]iven that all issues other than the potential award of public injunctive relief . . . will predominate over the relatively narrow issues concerning the propriety and scope of a public injunctive relief award," the Court finds that this case should be stayed in its entirety until arbitration concludes. *Dornaus*, 2019 U.S. Dist. LEXIS 24522, at *16-17.

### CONCLUSION

For the reasons set forth above, Defendants' Motion to Stay Pending Arbitration is **GRANTED**. This entire action is hereby **STAYED** until arbitration in accordance with the terms of the Arbitration Agreement concludes.

DATED: February 11, 2026

*Karen L. Stevenson*

HON. KAREN L. STEVENSON
CHIEF U.S. MAGISTRATE JUDGE